UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | |
|---|---|
| DARIN L.,[1] | : Case No. 2:22-cv-4464 |
| | : |
| Plaintiff, | : Magistrate Judge Peter B. Silvain, Jr. |
| | : (by full consent of the parties) |
| vs. | : |
| | : |
| COMMISSIONER OF THE SOCIAL | : |
| SECURITY ADMINISTRATION, | : |
| | : |
| Defendant. | : |

**DECISION AND ENTRY**

Plaintiff Darin L. brings this case challenging the Social Security Administration's denial of his application for Supplemental Security Income (SSI). This case is before the Court upon Plaintiff's Statement of Errors (Doc. #10), the Commissioner's Memorandum in Opposition (Doc. #12), Plaintiff's Reply (Doc. #13), and the administrative record (Doc. #8).

**I.   Background**

The Social Security Administration provides Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 1382(a). The term "disability" encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing "substantial gainful activity." 42 U.S.C. § 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to plaintiffs only by their first names and last initials. *See also* S.D. Ohio General Rule 22-01.

In the present case, Plaintiff's legal guardian filed an application for SSI on Darin's behalf on September 8, 2017, alleging disability beginning September 1, 2016. (Doc. #8-5, *PageID* #s 221-26). Plaintiff attained age 18 in January 2018.[2] Plaintiff is alleging disability due to epilepsy. (Doc. #8-6, *PageID* #239). After Plaintiff's application was denied initially and upon reconsideration, he requested and received a hearing before Administrative Law Judge (ALJ) Jeannine Lesperance. On March 20, 2020, ALJ Lesperance concluded that Plaintiff was not eligible for benefits because he was not under a "disability" as defined in the Social Security Act. (Doc. #8-2, *PageID* #s 42-67). After the Appeals Council denied review, Plaintiff filed a previous case in the United States District Court for the Southern District of Ohio, and this Court remanded the case to the Commissioner. *See [Darin L]. v. Comm'r of Soc. Sec.*, No. 2:21-cv-09, 2021 WL 4771269 (S.D. Ohio Oct. 13, 2021) (Jolson, M.J.), *report and recommendation adopted*, No. 2:21-CV-09, 2021 5299856 (S.D. Ohio Nov. 15, 2021) (Sargus, D.J.); (Doc. #8-12, *PageID* #s 1824-55). Upon remand, ALJ Jeffrey Hartranft held a subsequent hearing via telephone and issued a written decision, addressing each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 416.920. He reached the following main conclusions:

Step 1: Plaintiff has not engaged in substantial gainful employment since September 8, 2017, the date of the current pending application.

Step 2: [S]ince attaining age 18, [Plaintiff] has continued to have the following severe impairments: Epilepsy; Attention Deficit Hyperactivity Disorder (ADHD); and Neurocognitive Disorder.

Step 3: He does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

---

[2] The Court will not be addressing Plaintiff's claims for child SSI due to the issues raised in Plaintiff's Statement of Specific Errors. *See* Docs. #10 and #13.

| | |
|---|---|
| Step 4: | His residual functional capacity, or the most he could do despite his impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "light work… except he could frequently climb ramps and stairs; he should avoid climbing ladders, ropes, or scaffolds; he should avoid working around hazards, such as unprotected heights or performing work in proximity to exposed moving mechanical parts; and he should avoid occupational driving and should never operate heavy machinery. Mentally, he could perform simple, routine, repetitive, short-cycle tasks at an average pace without strict time or production demands; he could interact consistently with others on matters limited to the straightforward exchange of information without negotiation, persuasion, or conflict resolution responsibilities; and he could adapt to rare changes in duties, consistent with simple tasks that are explained or demonstrated, but he may require one to two reminders when learning a new task." |
| | He has no past relevant work. |
| Step 5: | He can perform a significant number of jobs that exist in the national economy. |

(Doc. #8-11, *PageID* #s 1766-94). Based on these findings, the ALJ concluded that Plaintiff has not been under a benefits-qualifying disability since September 8, 2017, the date the application was filed. *Id.* at 1794.

The evidence of record is adequately summarized in the ALJ's decision (Doc. #8-11, *PageID* #s 1761-95), Plaintiff's Statement of Errors (Doc. #10), the Commissioner's Memorandum in Opposition (Doc. #12), and Plaintiff's Reply (Doc. #13). To the extent that additional facts are relevant, they will be summarized in the discussion section below.

## II. Standard of Review

Judicial review of an ALJ's decision is limited to whether the ALJ's findings are supported by substantial evidence and whether the ALJ applied the correct legal standards. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 745-46 (6th Cir. 2007). Substantial evidence is such "relevant evidence that a reasonable mind

might accept as adequate to support a conclusion." *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)). It is "less than a preponderance but more than a scintilla." *Id.*

The second judicial inquiry—reviewing the correctness of the ALJ's legal analysis—may result in reversal even if the ALJ's decision is supported by substantial evidence in the record. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009). Under this review, "a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen*, 478 F.3d at 746 (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

### III. Discussion

In his Statement of Errors, Plaintiff contends that, "ALJ Hartranft's step five finding that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform lacks substantial support as ALJ Hartranft's hypothetical to the vocational expert indicating Plaintiff's seizures are 'controlled' is not supported by substantial evidence and is internally inconsistent with limitations in Plaintiff's residual functional capacity. As a result, ALJ Hartranft improperly relied upon the vocational expert's testimony which does not support the determination that Plaintiff is not under a disability as defined in the Social Security Act." (Doc. #10, *PageID* #s 2154-63). In response, the Commissioner maintains that the ALJ's finding that Plaintiff can perform other jobs existing in significant numbers is supported by substantial evidence. (Doc. #12, *PageID* #s 2169-73).

Because this case follows from a remand on a similar statement of error, it is prudent to discuss the Court's findings.  In *[Darin L.] v. Commissioner of Social Security,* Magistrate Judge Jolson remanded for the "narrow purpose of conducting another step-five analysis to assess, which, if any, of the three occupations can be performed under the epilepsy restrictions set forth in the ALJ's RFC."  2021 WL 4771269, at *9.  Although a narrow remand, the Court explained that the ALJ s reliance on the vocational expert's testimony did not constitute substantial evidence, in part, because ALJ Lesperance did not resolve the inconsistency between the vocational expert's testimony that an uncontrolled seizure condition would be work-preclusive and the conflicting evidence regarding whether Plaintiff's seizures were controlled.  *Id*. at *8-9.

At step five of the sequential analysis, the burden shifts to the Commissioner to prove that a significant number of jobs exist in the national economy that a plaintiff can perform with his residual functional capacity and vocational profile.  *See Staymate v. Comm'r of Soc. Sec.*, 681 F. App'x 462, 469 (6th Cir. 2017).  One of the methods that the ALJ may rely upon at step five is a vocational expert's testimony, "who may present evidence that includes information from outside the DOT, including other reliable publications, information obtained directly from the employers, or from a vocational expert's … experience in job placement or career counseling."  *Staymate v. Comm'r of Soc. Sec.*, 451 F. Supp. 3d 744, 765 (E.D. Mich. 2020).  When an ALJ solely relies upon a vocational expert's testimony, as in this case, the Court must review if substantial evidence supports the ALJ's reliance on that testimony.  *Id*.; (Doc. #8-11, *PageID* #1794).  If a vocational expert's testimony is unclear, and the ALJ does not clarify that testimony by rectifying it with the rest of the record, there is not substantial evidence to support the ALJ's decision.  *See Zerby v. Comm'r of Soc. Sec. Admin.*, No. 1:13-CV-1405, 2014 WL 3956778, at *6 (N.D. Ohio Aug. 13,

2014) (citing *Vincent v. Comm'r of Soc. Sec.*, CIV.A. 11-10476, 2012 WL 573630, at *5 (E.D. Mich. Jan. 31, 2012) ("A vocational expert's response to a flawed hypothetical question cannot serve as substantial evidence sufficient to uphold an ALJ's denial of disability insurance benefits").

ALJ Hartranft accounted for Plaintiff's risk of seizures at work in his RFC assessment. (Doc. #8-11, *PageID* #1784); *see* Doc. #8-11, *PageID* #1788 ("[T]he undersigned has accounted for [Plaintiff's] epilepsy by limiting him to light work, due to safety concerns while carrying heavy items, fatigue at times, which could be a medication side effect, limits on climbing and exposure to hazards, as well as a preclusion from occupational driving …"). Specifically, the ALJ included the following limitations: "he could frequently climb ramps and stairs; he should avoid climbing ladders, ropes, or scaffolds; he should avoid working around hazards, such as unprotected heights or performing work in proximity to exposed moving mechanical parts; and he should avoid occupational driving and should never operate heavy machinery." (Doc. #8-11, *PageID* #1784).

During the July 6, 2022 hearing, ALJ Hartranft posed a hypothetical to the vocational expert about the availability of jobs in the national economy for an individual with certain hypothetical limitations, including those he included in Plaintiff's RFC. (Doc. #8-11, *PageID* #s 1813-14). In response to these hypotheticals posed by the ALJ, the vocational expert was able to identify a significant number of jobs that would be available in the national economy for an individual with the specified limitations. *Id.*

Plaintiff's counsel questioned the vocational expert about the tolerance for seizure activity at the workplace to clarify her testimony from the previous hearing:

> **Q**: So Dr. Robinson, just to give you background for my question, the reason the Federal Court remanded the case was --they said -- it was unclear of whether the previous judge should have relied on your testimony because of what you just

> testified to and then what your response was in [sic] to the following question that I asked you at that hearing. So, I want to ask you that question again. Do you have an opinion based on your education, and your experience for what the tolerance is by employers for seizure activity in the workplace? Particularly if an individual has grand mal or [INAUDIBLE] type seizure that would require calling EMS personnel for treatment.
>
> **A**: My opinion is that they would not tolerate that in the workplace if a person has seizures to that extent where they have to call for emergency assistance, they will not maintain competitive employment. That is [liability] for the company to have someone in there that has seizures to that extent, particularly grand mal.
>
> **Q**: All right. That is consistent with your previous testimony, so I guess I don't have any other questions for you.

(Doc. #8-11, *PageID* #s 1814-15).

> The ALJ also asked the vocational expert about tolerance for seizures in the workplace:
>
> **Q**: First of all, Doctor, in your opinion, based on your education and experience, would it make a difference if the emergency services didn't need to be called?
>
> **A**: Yes, it would still make a difference.[3] If a person having a grand mal seizure and falling out in the workplace, it is again, a liability, whether the emergency service is called or not, it's still a liability.
>
> **Q**: Okay, I wanted to clarify that. And second, we're talking about this situation about whether this would continue employment the following a grand mal seizure. Now, if you can answer this based on your education and experience, **if a person had a history of seizures but were controlled, that were controlled by medication**, was limited in working to such things as the, you know, hazards, ladders, ropes, or scaffolds, moving machinery, such as in the previous one, **but had not had a seizure** and was up front about that, but with that employer, and was upfront about that, how would that affect employability, I guess would be the –
>
> **A**: I mean, generally, as long, I mean -- I won't say this of all employers, but this does happen with employers frequently and that is why we talk to people disclosing about physical disabilities or invisible disability, a person with a seizure because they have a history of seizures and they might have a seizure at work, we advise those people to tell their employers that they have a history of seizures. Now if they don't end up having any during, they most likely would not be terminated. **But if**

---

[3] Despite the vocational expert's response of "yes," based on the rest of her response, it appears that it would not make a difference if emergency services did not need to be called.

> **they ongoing have seizures at work, maybe one, maybe two**, they're not -- **it's not safe in the workplace.** I hope that answers your question.
>
> **Q**: So the potential for seizures isn't work-preclusive, assuming **they're adequately controlled by medication** which is an issue and can be resolved in this case. It's not work-preclusive. It is just when they are having seizures that it is. Fair enough. Okay.
>
> A: Yes.

(Doc. # 8-11, *PageID* #s 1815-17) (emphasis added).

Plaintiff asserts that substantial evidence does not support ALJ Hartranft's conclusion that his seizures are controlled. (Doc. 10, *PageID* #2160). He explains that ALJ Hartranft describing his seizures as "controlled" equated to finding him to be seizure-free. *Id*. at 2160-61. Plaintiff's argument is well taken.

When there is no evidence that the plaintiff's seizures resulted from a failure to take medication, "the ALJ's determination that the plaintiff's seizures were *well controlled* by medication is not supported by substantial evidence *on the whole record*." Moore v. Comm'r of Soc. Sec., No. 11-11857, 2013 WL 1278478, at *3 (E.D. Mich. Mar. 26. 2013) (emphasis added). Conversely, when individuals with a history of epilepsy are seizure free following compliance with medication, courts have affirmed the denial of benefits. *See Patton v. Comm'r of Soc. Sec.,* No. 1:13-CV-68, 2013 WL 5774709, at *3 (N.D. Ohio Oct. 24, 2013); *Brant v. Comm'r of Soc. Sec.*, 33 F. App'x 795, 797 (6th Cir. 2002); *Krauss v. Comm'r of Soc. Sec.*, 39 F. App'x 279, 280-81 (6th Cir. 2002) ("The medical evidence establishes that once Krauss was placed on a prescribed treatment plan, she remained *seizure free*…. [O]nce Krauss received the proper medical care, her seizure disorder was *controlled*.") (emphasis added).

The ALJ discussed Plaintiff's history of seizures and treatment in his decision and determined his seizures were "controlled" based on the record:

> With respect to [Plaintiff]'s epilepsy and seizure episode allegations, the record supports that [Plaintiff] continued to have some seizures after attaining age 18; however, within a few months of his 18th birthday, medication adjustments appear to have **effectively controlled his seizures**. Moreover, since attaining age 18, [his] reports to his treating sources do not support his testimony or his father's testimony at the prior hearing that he has seizures every month to six weeks.
>
> The record documents he sought emergency care for seizures in February 2018 (4F/15). He was noted as doing well for approximately three months, until he was incarcerated for bringing a weapon to school, and his medication timing was altered (*Id.* at 18-19). The record notes that his increased seizure frequency was noted to be likely due to missed doses and altered medication timing (See *Id.* at 21).
>
> Next, [Plaintiff] sought emergency care in March 2018, on the day he started a new job at McDonalds (4F/40). The record notes he had a cluster of seizures the following day as well (*Id.* at 68). He noted that he had taken his medication, but had not eaten anything all day and been awake late the night before (*Id.*). His ONFI dose was increased at this time (*Id.* at 69). His seizure control was noted as "much better," in early 2018, with two episodes of poor compliance noted as likely triggering seizures (*Id.* at 146). Later in March 2018, [Plaintiff] again had a seizure, though his father felt he may have once again missed a medication dose, as he was staying with his aunt (*Id.* at 152).
>
> Thereafter, the record notes he had another breakthrough seizure in April 2018 (*Id.* at 185-195). He indicated that he had been compliant with his medication at this time, though had recently had a medication change, and he had more seizures after taking a Klonopin bridge (*Id.* at 182). He had another seizure in the emergency department and took Ativan and Fosphenytoin at that time to get them controlled (*Id.* at 195).
>
> In June 2018, [Plaintiff] reported he was doing better and not having seizures after being started on ONFI (5F/17). Next, in July 2018, he reported that he had not had a seizure in a long time. (*Id.* at 49). Thereafter, the record notes he reported he did not have any seizures through September 2018 (*Id.* at 55). In November 2018, he was noted as doing well with his seizures since his medication change (*Id.* at 91). Subsequently, in December 2018, he indicated that his last seizures had occurred eight months earlier, in April 2018 (*Id.* at 103). In January 2019, he again reported that he was not having seizures, and he was doing well overall (*Id.* at 127).

In March 2019, the record notes that [Plaintiff]'s social worker reported that a medical provider would not sign a form stating that [Plaintiff] could not work, as the provider noted that "… outside of working with heavy machinery, [Plaintiff] could seek employment," as per the last office visit, because **his seizures were controlled** (5F/ 139). … [Plaintiff's] father indicated that while the ONF1 medication had been effective, as [Plaintiff] was noted as having only one seizure since starting the medication (*Id.* at 140). However, he was noted as often sleeping and having mood swings (*Id.*).

[Plaintiff] sought emergency care and was admitted from May 4, 2019 through May 5, 2019 with seizures, and the record notes he was not certain he had taken his medication (5F/168). Moreover, the record notes that his father thought he may not have taken his medication (*Id.* at 184). In July 2019, the record notes that an LTM/Spect scan test was scheduled for August 19, 2019 (6F/46). During a phone call on September 5, 2019, he indicated that he had a seizure about two weeks before this date, and this was his first seizure in a while; additionally, he reported that his typical seizure frequency was about once every 3-6 months (*Id.* at 75). In October 2019, he reported some focal seizures with twitching that most recently happened about a month ago but typically occur many months to years apart (*Id.* at 142). He also reported his generalized tonic clonic seizures decreased to approximately one per month after a change of medication in May 2019 (*Id.*). His most recent generalized tonic clonic seizure was reportedly also about a month earlier, and his longest stretch without a seizure was noted to be about seven months (*Id.*). Given his complaints of poor control with reported compliance, his doctor sent him back to the EMU; however, they were unable to elicit any seizures despite provocation and no medication (5F/203).

….

Overall, a review of the [Plaintiff's] treatment records since his hearing in February 2020 continued to indicate either a stable or improved condition. Moreover, the treatment notes from September 2020 do not support the allegation as to one to three seizures per month; the [Plaintiff] reported that he had had three or four seizures over the past year, and his most recent episode had occurred three months prior (7F/4). … The record notes the possibility of independent bifrontal onset, and an ictal SPECT could not be obtained, due to no seizure capture in November 2019 (Id.) Further, the record noted he has had infrequent seizures (maybe 3 or 4 in the last year) (Id.).

[Plaintiff] was next seen in March 2021 and was counseled to improve medication compliance (7F/25). Thereafter, his visit in November 2021 noted a largely unchanged condition, indicating that he again had three to four seizures over the

> past year (Id. at 41). Additionally, he was again counseled on medication compliance (Id. at 41-46).
>
> Most recently, [Plaintiff] was most recently seen on June 30, 2022, at the NCH/OSU Epilepsy Transition Clinic; he was noted to continue to have 1 seizure every 4-5 months (9F/9). It was further noted that, since being switched from Trileptal to Oxtellar, he no longer [was] experiencing clustering, which is an improvement, and he was noted to be compliant with his medications, which was also indicated to be a change since the prior visit (Id. at 9). The record notes he does not appear to have any side effect on this medication (Id. at 5). Despite reported issues with both short-term and long-term memory, the associated physical examination revealed grossly normal results, noting normal Mental Status findings, normal motor/muscular function, normal sensory function, normal cerebellar function, and a normal gait (Id. at 8).
>
> ….
>
> …As noted, the previously discussed neuropsychological evaluation was done **before [Plaintiff's] seizures were well-controlled**, and he was noted to have active discharges in his video EEG that had taken place only a couple months earlier. However, the record documents that once he was placed on a new medication (ONFI), **his seizures were largely controlled**, …

**(**Doc. #8-11, *PageID* #s 1785-88) (emphasis added).

Notably, the ALJ's own summary of the medical evidence—including evidence that Plaintiff still experiences seizures while compliant with medication—conflicts with his conclusion that Plaintiff's seizures are controlled with medication. *See id*. at 1786 (Plaintiff had a breakthrough seizure in April 2018 while compliant with medication); *id*. at 1788 (Plaintiff had one seizure every four to five months in June 2022 while compliant with medication); (Doc. #8-16, *PageID* #s 2117, 2126-27). Furthermore, as Plaintiff correctly points out, the ALJ fails to discuss that his epilepsy is repeatedly characterized in the medical records as "intractable," (Doc. #s 8-7, 8-9, 8-10, 8-16, *PageID* #s 567, 985, 1081, 1167, 1304, 1449, 2037, 2055, 2057, 2068, 2078, 2106), "drug resistant," (Doc. #s 8-8, 8-9, 8-16, *PageID* #s 880, 1085, 1171, 1487, 2037),

11

and "medically refractory," (Doc. #8-10, *PageID* #s 1339, 1344). (Doc. #10, *PageID* #2158). Indeed, in addition to these numerous citations, Plaintiff's seizures are further described as "intractable" in more recent records, including his most recent doctor's visit in June 2022. (Doc. #8-16, *PageID* #s 2108, 2112-13, 2116, 2119, 2124-25, 2129-32). Additionally, the ALJ ignores or overlooks evidence in conflict with his conclusion that Plaintiff's seizures are controlled with medication. For instance, during the last four doctor visits in the record—September 2020, March 2021, October 2021, and June 2022—Plaintiff's doctors discussed surgery or diet therapy as alternative treatment for his intractable epilepsy, indicating a continuous and active concern. *Id*. at 2037, 2055, 2075, 2126. Significantly, in June 2022, Plaintiff's doctor increased one of his seizure medications, with an indication that it may be further maximized "if effective" to address the fact he was still having seizures, even while compliant with medication. *Id*. at 2131. Furthermore, Plaintiff's doctor indicated that they would discuss at the next visit both surgery and additional medication changes "if he continues to have intractable epilepsy, especially since he endorses compliance at this visit (previously was having missed medication doses)." *Id*.

      In the ALJ's otherwise lengthy overview and analysis of the medical records, he did not once refer to Plaintiff's continuing diagnosis of intractable epilepsy, including increased dosage of his medication and alternative treatment options. (Doc. #8-11, *PageID* #s 1785-88). While an ALJ is not required to discuss every piece of evidence in the record, *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2016), his decision cannot be upheld if it is based on a "selective review" of the evidence. *Howard v. Barnhart*, 376 F.3d 551, 554 (6th Cir. 2004). "[I]f there is conflicting evidence which is material to the outcome of the case, but the ALJ fails to resolve it, the denial of benefits is not substantially justified." *McClellan v. Comm'r of Soc. Sec.*,

No. 2:10-cv-118, 2012 WL 7822215, at *3 (E.D. Tenn. Jan. 26, 2012), *report and recommendation adopted sub nom. McClellan v. Astrue*, 2013 WL 1292667 (E.D. Tenn. Mar. 28, 2013) (citing *Howard*, 376 F.3d at 554). In light of the conflicting evidence and the ALJ's selective review of that evidence, the undersigned finds that substantial evidence does not support the ALJ's conclusion that Plaintiff's seizures are controlled such that he is seizure free.

As noted above, the ALJ based his conclusion that there are jobs existing in significant numbers in the national economy that Plaintiff can perform on the vocational expert's testimony. (Doc. #8-11, *PageID* #1793-94). However, the vocational expert testified that even one seizure at work would be work-preclusive, regardless of whether EMS personnel were called. (Doc. #8-11, *PageID* #s 1815-16). The ALJ failed to sufficiently reconcile the vocational expert's testimony with both his seizure-risk RFC and Plaintiff's intractable epilepsy. (Doc. #8-11, *PageID* #s 1784, 1788, 1815-16); (Doc. #8-16, *PageID* #s 2117, 2126-27, 2131).

The ALJ was not entitled to simply ignore the vocational expert's relevant testimony or Plaintiff's intractable epilepsy, especially during periods of medical compliance. (Doc. #8-11, *PageID* #1816); (Doc. #8-8, *PageID* #s 912, 915); (Doc. #8-16, *PageID* #s 2117, 2126-27, 2131). Rather, he should have resolved the inconsistencies between Plaintiff's intractable epilepsy and the vocational expert's testimony that even one seizure at work would be work-preclusive before crafting a seizure-risk RFC. (Doc. #8-11, *PageID* #1784).[4] His failure to do so constitutes reversible error.

---

[4] Notably, Judge Jolson previously found the inconsistences between the vocational expert's testimony that one seizure during work would be work-preclusive, a seizure-risk RFC, and a conflicting medical history regarding Plaintiff's seizures and remanded the case for the narrow purpose of conducting another step-five analysis to resolve the issue. *See [Darin L.]*, 2021 WL 4771269, at *8-9.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.

## IV. Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming, and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to a remand to the Social Security Administration pursuant

14

to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether his application for Supplemental Security Income should be granted.

**IT IS THEREFORE ORDERED THAT**:

1. Plaintiff's Statement of Errors (Doc. #10) is **GRANTED;**

2. The Commissioner's non-disability finding is **VACATED**;

3. No finding is made as to whether Plaintiff was under a "disability" within the meaning of the Social Security Act;

4. This matter is **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Entry; and

5. The case is terminated on the Court's docket.


March 29, 2024
*s/Peter B. Silvain, Jr.*
Peter B. Silvain, Jr.
United States Magistrate Judge